1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  GAIL REINA SAWYER, an individual,

12                                     Plaintiff,

13         vs.

14

15  HARTFORD LIFE AND ACCIDENT
    INSURANCE COMPANY, a business entity
16  of unknown form; SEARS LIFE
    INSURANCE COMPANY, a business entity
17  of unknown form; and DOES 1 through 50,
    inclusive,

18                                     Defendants.

CASE NO. 10-cv-1293-MMA (BLM)

**ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT SEARS LIFE
INSURANCE COMPANY'S
MOTION FOR SUMMARY
JUDGMENT**

[Doc. No. 20]

19
20

## INTRODUCTION

21

        Plaintiff Gail Reina Sawyer filed the above-captioned action against Defendants Sears Life

22  Insurance Company's ("SLIC") and Hartford Life Insurance Company ("Hartford") in San Diego

23  Superior Court for breach of insurance contract and breach of the implied covenant of good faith

24  and fair dealing.  Sawyer alleges that Defendants wrongfully denied coverage of her insurance

25  claim arising out of her father Charles Potter's death.  On June 17, 2010, Defendants removed the

26  action to this Court.  Sawyer subsequently settled her claim with Hartford, so Hartford is no longer

27  a party to this action.  Currently before the Court is SLIC's Motion for Summary Judgment

28

pursuant to Federal Rule of Civil Procedure 56.  The Court found the motion suitable for decision on the papers and took the motion under submission pursuant to Civil Local Rule 7.1.d.1.  For the reasons set forth below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

The following facts are not reasonably in dispute.[1]  In 2003, after responding to a solicitation letter in the mail, Charles Potter purchased an accidental death insurance certificate (the "Certificate") from SLIC and thereafter he paid SLIC a premium of $9.96 per month for the Certificate.  The Certificate provided $100,000 in coverage if Potter died: "(1) while occupying a private passenger automobile; (2) through being struck by a land motor vehicle; or (3) while driving for hire a land motor vehicle."  [Doc. No. 20-4, Ex. 1, p. 4.]  For all other accidents, the Certificate provided $50,000 in coverage.  The Certificate defines "Accidental Death" as "[d]eath resulting directly from bodily injury effected solely through external, violent and accidental means."  [*Id.* at p. 3.]  The Certificate defines "Loss" as "An Accidental Death.  The accident must occur while your insurance is in force.  The Loss must occur within 365 days of the accident.  The Loss must result directly from the accident and be independent of all other causes."  [*Id.*]  The policy also excludes losses "directly caused . . . by disease, or bodily or mental infirmity."

On June 23, 2009, Potter drove from San Diego headed for his vacation home in La Ribera, Mexico, located approximately 1,025 miles south of San Diego.  Somewhere between Cuidad Constitucion and La Paz, Mexico, Potter lost control of his vehicle, crossed over the road, and went down the embankment.  [*Fritz Dec.*, Doc. No. 21, ex. 2, ¶¶ 6, 8.]  Potter's vehicle ended up about 50 yards into the desert, landed on a tree, and was later declared a total loss.  [*Id.*]  He was trapped in his car for approximately eight hours in 100 degree heat before a tow truck came and drove him to his home in La Ribera.  [*Id.* at ¶¶ 8-11.]  The day after the accident Potter did not feel well, but insisted that he did not need to see a doctor.  However, the following day, two days after the accident, Potter had trouble breathing and was rushed to a hospital in San Jose de Cabo,

---

[1] Defendant did not submit a separate statement of undisputed material facts in support of its motion for summary judgment, as required by the undersigned's chambers Rule II.

1   Mexico.  [*Fritz. Dec.*, Doc. No. 21-2, ¶ 15]

2       When Potter was admitted to the hospital he was cyanotic, and suffering from dehydration

3   and edema in his lower limbs.  [*Pltf.'s Oppo.*, Doc No. 21, p. 8.]  He was treated with

4   supplemental oxygen and heparin.  [*Id.*]  Three hours after being admitted, Potter slipped into a

5   coma and never recovered.  [*Id.*]  Potter died at 12:20 a.m. on June 26, 2009.  [*Id.*]  The final

6   diagnosis of the treating cardiologist in the hospital, Dr. Alejandro Velderrain Zazueta, was

7   "chronic obstructive pulmonary disease, auricular fibrillation, cerebrovascular event, possibly

8   cardiac-induced, core pulmonale, and congestive heart failure."  [*Pltf.'s Notice of Lodgment

9   ("NOL")*, Doc. No. 21-1, Exh. 15.[2]]  Dr. Velderrain also noted that Potter suffered "an accident

10   that made him remain seated for a long time in his vehicle, which possibly increased the risk of

11   thrombosis."  [*Id.*]  After Potter's death, the U.S. Consulate issued a Report of Death of American

12   Citizen Abroad, and based upon Dr. Velderrain's diagnosis, the report listed the cause of death as

13   "cerebral thrombosis [stroke], chronic ventricular fibrillation, [and] cardiac insufficiency."  [20-4,

14   Exh. 4.]

15       Potter died at the age of  71.  When he died, Potter was six feet three inches tall, and

16   weighed over 300 pounds.  Potter suffered from various health issues including chronic obstructive

17   pulmonary disease ("COPD") and Cor Pulmonale (a failure of the right side of the heart).  [Doc.

18   No. 20, p. 3.]  In May and June of 2009, Potter treated with a cardiologist who diagnosed him with

19   an arterial flutter.  [Doc. No. 24-4, Exh. 8.]  Potter was also hospitalized in 2006 with a pulmonary

20   embolism.  [Doc.  No.  21-5, ¶ 36.]

21       After Potter's death, his daughter Gail Reina Sawyer submitted a claim to SLIC as the

22   beneficiary under the Certificate.  Sawyer stated on SLIC's accidental death claim form that Potter

23   "[l]ost control on soft shoulder.  In desert heat for 16 hours after trauma of accident.  This

24   contributed to the stress of his condition and caused a stroke leading to death on 6/26/09."  [Doc.

25

26       [2] The original chart note is in Spanish.  Two translated versions were submitted, one version was translated by
27   a SLIC employee and the other version is a certified translation from the Hartford claim file.  The Court will reference
    the certified translation.

28

No. 20-4, Exh. 3, p. 1.]  Sawyer also submitted the U.S. Consulate's Report of Death, a letter from Dr. Velderrain (in Spanish), a hospital bill, and a copy of Potter's Will.  [Doc. No. 20-4, Exh. 5.] SLIC requested Potter's medical records from Potter's primary care physician, Dr. Mohedin. [Doc. No. 20, p. 4.]  Dr. Mohedin did not provide Potter's medical records and instead responded with a statement that he had seen Potter on April 20, 2009 for an exacerbation of his COPD, and on May 18, 2009, Dr. Mohedin diagnosed Potter with right sided heart failure (Cor Pulmonale) and referred him to a cardiologist.  [Doc. No. 20-4, Exh. 8.]  On February 8, 2010, SLIC denied the claim on the basis that Potter's death was not the direct result of an injury resulting from a covered accident.  [Doc. No. 20-4, Exh. 9.]

On April 5, 2010, Sawyer filed this action in the San Diego Superior Court against SLIC for breach of insurance contract and breach of the covenant of good faith and fair dealing ("bad faith" claim).  Sawyer also seeks attorneys fees and punitive damages.  On June 17, 2010, SLIC timely removed the action based on diversity of citizenship under 28 U.S.C. §§ 1332(a) and 1441(a).

SLIC now moves for summary judgment on Sawyer's breach of contract claim because Potter's death was not covered by the Certificate as a matter of Law.  SLIC argues in the alternative that even if there is coverage, the most Sawyer is entitled to under the Certificate is $50,000.  SLIC also moves for summary judgment on the bad faith claim arguing that SLIC did not act in bad faith because there was a genuine dispute over coverage.  Finally, SLIC moves for summary judgment on the punitive damages claim because Sawyer cannot prove, by clear and convincing evidence, that SLIC's denial of coverage involved fraud, oppression or malice.

In opposition to the motion, Sawyer argues that SLIC is not entitled to summary judgment on her breach of contract claim because the claim is covered by the Certificate.  Sawyer argues that Potter's death resulted from his car accident, and that she does not have to establish that Potter's death resulted solely from the accident.  Sawyer also argues that SLIC is bound by the coverage stated in the solicitation letter sent to Potter, and that the $100,000 coverage limit applies based on the terms of the solicitation letter.  Additionally, Sawyer argues that SLIC is not entitled

1    to summary judgment on the bad faith claim because SLIC acted unreasonably in investigating and

2    denying coverage.  Finally, Sawyer argues that she is entitled to punitive damages because SLIC

3    acted in conscious disregard of her rights in denying coverage of the claim.[3]

4                          **SUMMARY JUDGMENT STANDARD**

5           Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment "if

6    the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

7    affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

8    party is entitled to a judgment as a matter of law." *Hubbard v. 7-Eleven*, 433 F. Supp. 2d 1134,

9    1139 (S.D. Cal. 2006) (citing former Fed. R. Civ. P. 56(c)(2)).  "The moving party bears the initial

10   burden to demonstrate the absence of any genuine issue of material fact." *Horphag Research Ltd.*

11   *v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (citation omitted).  "Once the moving party meets

12   its initial burden, . . . the burden shifts to the nonmoving party to set forth, by affidavit or as

13   otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial."

14   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks and citations

15   omitted).

16          A mere scintilla of evidence is not sufficient "to defeat a properly supported motion for

17   summary judgment; instead, the nonmoving party must introduce some 'significant probative

18   evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d

19   1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249, 252).  Thus, in opposing a

20   summary judgment motion, it is not enough to simply show that there is some metaphysical doubt

21   as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

22   (1986) (citations omitted).  However, when assessing the record to determine whether there is a

23   "genuine issue for trial," the court must "view the evidence in the light most favorable to the

24   nonmoving party, drawing all reasonable inferences in his favor." *Horphag*, 475 F.3d at 1035

25

26          [3]  SLIC filed a reply brief, accompanied by numerous evidentiary objections.  The Court considered SLIC's
27   objections and did not rely upon any inadmissible evidence in deciding SLIC's motion for summary judgment.  To the
     extent that the Court considered evidence objected to by SLIC, the objections are overruled.

28

(citation omitted).  On summary judgment, the Court may not make credibility determinations; nor may it weigh conflicting evidence.  *See Anderson*, 477 U.S. at 255.  Thus, as framed by the Supreme Court, the ultimate question on a summary judgment motion is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251-52.

## DISCUSSION

*A.*     *Breach of Insurance Contract Claim*

1.     Coverage

SLIC argues that it is entitled to judgment as a matter of law on Sawyer's breach of insurance contract claim because Sawyer has not established a triable issue of fact as to coverage under the policy.  In California, the person claiming the accidental death benefits has the burden of establishing that the insured's death resulted from an accident.[4]  *Ells v. Order of United Commercial Travelers of America*, 20 Cal. 2d 290, 304 (1942); *Spaid v. Cal-Western States Life Ins. Co.*, 130 Cal. App. 3d. 803, 806-07 (1982).  To survive summary judgment, Plaintiff must present sufficient evidence to convince a reasonable jury that the death was the result of an accident.  *Schar v. Hartford Life Ins. Co.*, 242 F. Supp. 2d 708, 714 (N.D. Cal. 2003).  For the reasons set forth below, the Court finds that Sawyer satisfies this burden and raises triable issues of fact regarding the cause of Potter's death and coverage by the Certificate.

*a)*     *Whether Potter's Death was "Accidental"*

First, SLIC argues that Potter's death is not covered by the Certificate because it was not "accidental."  SLIC argues Potter died of a stroke, which is not an "external" event as a matter of

---

[4]  A federal district court sitting in diversity jurisdiction is to interpret and apply the substantive law of the forum state.  *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).  The parties do not dispute that California is the forum state and its law is to be applied in this case.  Therefore, California substantive law applies.  *Insurance Co. of Pennsylvania v. Associated Int'l Ins. Co.*, 922 F.2d 516, 520 (9th Cir. 1990) (as amended 1991); *Continental Casualty Co. v. City of Richmond*, 763 F.2d 1076, 1079 (9th Cir. 1985).

1   law.[5]  In opposition, Sawyer argues that the Certificate covers Potter's death because it resulted

2   from the car accident, which was an "external, violent and accidental" event.

3       Interpretation of an insurance policy is a question of law, which is determined by looking

4   first "to the language of the contract in order to ascertain its plain meaning or the meaning a lay

5   person would ordinarily attach to it."  *Waller v. Truck Ins. Exch. Inc.*, 11 Cal. 4th 1, 18 (1995)

6   (citing Cal. Civ. Code § 1638).  Interpretation "must give effect to the 'mutual intention' of the

7   parties," which should be "inferred, if possible, solely from the written provisions of the contract."

8   *Id.* (citing Cal. Civ. Code § 1639).  "California courts apply certain special rules for the

9   interpretation of insurance contracts in order to protect the objectively reasonable expectations of

10  the insured."  *Bornstein v. J.C. Penney Life Ins. Co.*, 946 F. Supp. 814, 818 (C.D. Cal. 1996).

11  Because the insurer is the drafter of the policy and the insured has little bargaining power over the

12  policy terms, exclusions are interpreted narrowly and terms extending coverage are construed

13  broadly.  *Id.*

14      Under California law, where an accidental death policy does not define the term

15  "accident," courts require that the "accidental death" be caused by "some form of external events

16  and forces, as opposed to purely "natural" processes," such as "aging, congenital defects and

17  disorders, and cancer."  *Khatchatrian v. Cont'l Cas. Co.*, 332 F.3d 1227, 1229 (9th Cir. 2003).  In

18  *Khatchatrian*, the insurance policy at issue defined "Injury" as "bodily injury caused by an

19  accident . . . that results, directly and independently of all other causes, in loss covered by the

20  policy."  *Id.* at 1227.  The policy, however, did not define the term "accident."  *Id.*  The district

21  court granted summary judgment in favor of the insurer, ruling that the cause of the insured's

22  death, a stroke, was not an "accident" within the meaning of the policy as interpreted under

23  California law.  *Khatchatrain v. Cont'l Cas. Co.*, 198 F. Supp. 2d 1157 (C.D. Cal. 2002).  The

24  district court noted that "Plaintiff does not contend that any unforeseen event taking place outside

25

26      [5]  The Certificate defines "Accidental Death" as "[d]eath resulting directly from bodily injury effected solely
27  through external, violent and accidental means." [Doc. No. 20-4, Ex. 1, p. 3.]  As discussed *infra*, while the Certificate
    defines "accidental death," it does not define the term "accident."

28

1    the body of [the insured] -- i.e., an external event -- was the proximate cause of the insured's

2    stroke." *Id*. at 1163.  The Ninth Circuit affirmed, holding that the insured's death was not

3    "accidental" because the stroke he suffered was the result of natural rather than external causes.

4    *Khatchatrian,* 332 F.3d at 1229.

5            Here, the Certificate does not specifically define the term "accident," but it does define

6    "Accidental Death" as "[d]eath resulting directly from bodily injury effected solely through

7    *external, violent and accidental means*."  [Doc. No. 20, Ex. 1, p. 3.]  The Certificate's definition of

8    "Accidental Death" parallels the Ninth Circuit's holding in *Khatachatrian,* requiring the accidental

9    death to result from "external" rather than "natural" causes.  Thus, *Khatachatrian* is instructive in

10   determining whether the death at issue here was "accidental" within the meaning of the policy.

11   Like the insured in *Khatchatrian*, Potter died of a stroke.  In that case, the Ninth Circuit expressly

12   held that death by stroke is not an "external" event.  *Khatchatrian,* 332 F.3d at 1229.  However, in

13   *Khatchatrian*, the stroke resulted from the insured's progressively worsening hypertension due to

14   renal cancer.  198 F. Supp. 2d at 1159.  In contrast, in the present case there is evidence that

15   Potter's stroke was caused by an external event, the June 23, 2009 car accident.  According to

16   Sawyer, the trauma of the car accident, the heat and resulting dehydration, and the extended period

17   of immobilization combined to cause the stroke that ultimately led to Potter's death.  [Doc. No. 21,

18   p. 14, citing Bernstein Decl'n ¶¶ 4-36.]

19           However, SLIC argues that Sawyer does not offer any admissible evidence to establish a

20   causal connection between the accident and Potter's death three days later.  [Doc. No. 20, p. 7.]

21   SLIC argues that this case is analogous to *Parra v. Cigna Group Ins.*, in which the insured died

22   four days after he was involved in a minor car accident.  258 F. Supp. 2d 1058, 1060 (N.D. Cal.

23   2003).  The insured in *Parra* suffered from a number of serious ailments, including end-stage

24   cirrhosis of the liver, advanced diabetes, advanced coronary artery disease, hypertension, and

25   Hepatitis B.  *Id.* at 1061.  In that case, the only evidence that the accident caused the death of the

26   insured was his wife's speculation.  The court granted summary judgment in favor of the insurance

27   company, finding that the plaintiff did not satisfy her burden of establishing that "the accident

28

1    caused her husband's death, or at least set in motion a series of events that resulted in his death."

2    *Id*. at 1068.

3         Here, Plaintiff presents evidence sufficient to raise a triable issue regarding whether

4    Potter's accident caused his death.  In contrast to *Parra*, there is evidence that Potter's accident

5    was quite serious.  For example, the parties do not dispute that Potter's vehicle landed on a tree

6    and the damage was so extensive that it was later declared a total loss.  There is also evidence that

7    Potter was trapped in his car for approximately eight hours in the desert, in temperatures upwards

8    of 100 degrees, without air conditioning.  Additionally, unlike *Parra*, Plaintiff offers evidence to

9    support her theory that there was a causal connection between the accident and Potter's death.

10   Plaintiff's theory is supported by the chart notes made by Dr. Velderrain, the cardiologist who

11   treated Potter in the hospital in Mexico, and the declaration of Plaintiff's medical expert, Robert E.

12   Bernstein, M.D.  Dr. Velderrain's final diagnosis stated that Potter suffered "an accident that made

13   him remain seated for a long time in his vehicle, which *possibly increased the risk of thrombosis*."

14   [Doc. No. 21-1, Exh.15.]  [*Emphasis added*.]  Additionally, Dr. Bernstein reviewed Potter's

15   medical records and concluded the vehicle accident "directly contributed to Mr. Potter's death."

16   [Doc. No. 21-5.]  Furthermore, Sawyer presents evidence that, unlike the insured persons in

17   *Khatchatrian* and *Parra*, Potter was medically stable in the days and weeks leading up to his

18   death.  [Doc. No. 21-5, ¶ 12(j).]  This evidence is sufficient to raise a genuine issue of material fact

19   regarding whether the car accident, an "external" event, caused Potter's death.

20   **b)      *Whether the Accident Must be the "Sole" Cause of Death***

21        Second, SLIC argues that Plaintiff has not put forth any evidence that the car accident was

22   the "sole" cause of Potter's death, as required by the terms of the Certificate.  [Doc No. 20, p. 9,

23   citing Exh. 1, p. 3.]  According to SLIC, the car accident was not the "sole" cause of Potter's death

24   because at a minimum, the car accident combined with other non-accidental causes (Potter's poor

25   health) to cause his death.  In opposition, Plaintiff argues that she is not obligated to prove that

26   Potter's death resulted solely from the accident, because under California law, when multiple

27   causes combine to cause the insured's death, the accident need only be the proximate cause of

28

1   death, not the sole cause.  *See Brooks v. Metropolitan Life Ins. Co.*, 27 Cal. 2d 305, 309-10 (Cal.

2   1945).

3          In *Brooks v. Metropolitan Life Ins. Co.,* the California Supreme Court set forth the

4   applicable rule where an insured risk combines with an excluded risk to cause the insured's death.

5   In that case, the insured, afflicted with debilitating cancer, was covered by an accident policy that

6   excluded death caused wholly, partly, directly or indirectly by disease.  *Id.* at 306.  After the

7   insured died in a fire, his widow sought to recover the benefits payable under the policy for death

8   by fire.  The California Supreme Court held that under such circumstances, "the presence of

9   preexisting disease or infirmity will not relieve the insurer from liability *if the accident is the*

10  *proximate cause of death* . . . [Recovery] may be had even though a diseased or infirm condition

11  appears to actually contribute to cause the death if the accident sets in progress the chain of events

12  leading directly to death, or if it is the prime or moving cause."  *Id.*  (*Emphasis added*).

13         The California Supreme Court later adopted the term "efficient proximate cause" to

14  describe the applicable standard in cases where multiple causes combine to cause a loss.  *See*

15  *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal. 3d 395, 401-405 (Cal. 1989).  The efficient

16  proximate (meaning predominant) cause of the loss is "the one that sets others in motion . . .

17  though the other causes may follow it and operate more immediately producing the disaster."  *Id.*

18  at 402.  (Quoting *Sabella v. Wisler,* 59 Cal.2d 21, 31-32 (1963).  When there is a predominant

19  cause, the loss is attributed to this cause, notwithstanding the other contributing causes.  *Id.*

20         In its reply, SLIC argues that the "proximate cause" analysis set forth in *Brooks* and its

21  progeny is expressly excluded by the Certificate's requirement that the accident must be the "sole"

22  cause of death.  SLIC goes on to state that no California court has specifically addressed the effect

23  of the "solely" language in the Certificate, so it relies instead on law from outside the jurisdiction

24  to support its contention that this language precludes the proximate cause analysis.  However, the

25  Court found several California cases which applied the *Brooks* "proximate cause" analysis to the

26  issue of multiple causation, despite policy language limiting coverage to injuries caused "solely"

27  by the accident.  *See e.g. Shafer v. American Casualty Co.*, 4-7 (Cal. App. 1st Dist. 1966);

28

1   *Wharton v. the Prudential Ins. Co.*, 122 Cal. App. 2d 857, 864-65 (Cal. App. 4th Dist. 1954);

2   *Miller v. United Ins. Co.*, 113 Cal. App. 2d 493, 499 (Cal. App. 3rd Dist. 1952) (the pertinent

3   clause of the policy in question insured "against loss resulting directly and independently from all

4   other causes from bodily injuries sustained by accidental means . . . provided, such injury was

5   caused *solely* by the collision . . .") (*Emphasis added*).

6          For example, in *Shafer v. American Casualty Co.,* the insured was in an automobile

7   accident and sustained a bruise on his arm and suffered shock as a result of the accident.  245

8   Cal.App.2d at 3.  At the time of the accident, the insured had a serious condition of arteriosclerosis

9   and a greatly enlarged heart.  *Id.*  Two days after the accident the insured died from a heart attack.

10  *Id.*  The policy at issue in *Shafer* provided that the insurer "will pay $10,000 for the death of the

11  insured 'resulting directly and independently of all other causes from bodily injury sustained

12  during the term of the policy [ ] and effected *solely* through accidental means, . . .'" *Id.* at 2

13  (*Emphasis added*).  The trial court found that the heart attack that resulted in the insured's death

14  "was caused by a concurrence of two things; one, the shock (bodily injury) sustained in the

15  accident and, two, the diseased condition (arteriosclerosis and enlarged heart) which decedent had

16  at the time of the accident." *Id.*  The trial court ultimately concluded that "the accident was the

17  precipitating and proximate cause of the [heart attack] which resulted in the [insured's] death."  *Id.*

18  at 4.  The California Court of Appeal applied the *Brooks* proximate cause standard to the facts of

19  the case and held there was evidence to support the trial court's conclusion that the accident was

20  the proximate cause of the heart attack which resulted in the death.  *Id.* at 10.

21         Similarly, in *Wharton*, the insured was diagnosed with chronic alcoholism with

22  dependancy on barbiturates and was hospitalized several times.  122 Cal. App. 2d at 859.  During

23  his last hospital stay, he fell and died.  *Id.* at 859-861.  The life insurance policy at issue provided

24  for the payment of accident insurance upon "due proof that the death of the insured occurred as a

25  result, directly and independently of all other causes, of bodily injuries effected *solely* through

26  external, violent and accidental means." *Id.* at 858.  (*Emphasis added*).  The insurance company

27  paid the life insurance but refused to pay the accident insurance, contending that the death was not

28

1   caused by accidental means, but rather by the insured's poor health and alcoholism.  *Id*.  The

2   beneficiary sued the insurance company arguing that the death was accidental because the primary

3   cause of death was a fractured femur that resulted from the fall.  *Id*. at 861.  A jury returned a

4   verdict in favor of the insured and the defendant insurance company appealed.  *Id*. at 858.  In its

5   review of the evidence, the Court of Appeal noted that there was evidence of the insured's

6   condition prior to the fall that made it seem "unlikely that his condition was such that death could

7   be expected almost momentarily."  *Id*. at 865.  For example, the Court noted that the insured "had

8   a similar fall less than three months before with no serious results."  Based on this evidence, the

9   California Court of Appeal concluded that the question of what caused the death was a question of

10  fact for the jury, and the evidence presented at trial was sufficient to sustain the jury's verdict.  *Id*.

11      Here, there is evidence that multiple causes, mainly the car accident and Potter's health

12  problems, combined to cause Potter's ultimate demise.  As revealed by *Shafer*, *Miller* and

13  *Wharton*, the "proximate cause" analysis set forth in *Brooks,* and modified by subsequent case

14  law, is appropriate where multiple causes combine to cause the death of the insured.  This rule

15  applies even where the policy requires the injury sustained in the accident to be the "sole" cause of

16  death, independent of all other causes.  Accordingly, under California law, in order to establish

17  that Potter's death is covered by the Certificate, Plaintiff must prove the accident was the "efficient

18  proximate cause" or "predominant cause" of Potter's death.

19      Plaintiff offers evidence that raises a triable issue of fact regarding whether the accident

20  was the predominant cause of Potter's death.  As discussed above, Plaintiff presents evidence of

21  the serious nature of the accident.  According to Plaintiff, the trauma of the car accident, the heat

22  and resulting dehydration, and the extended period of immobilization combined to cause the stroke

23  that caused Potter's death.  This claim is supported by Dr. Velderrain's chart notes and Dr.

24  Bernsein's declaration.  [See discussion *supra*.]  Furthermore, like in *Wharton*, the evidence of

25  Potter's health reveals it was unlikely that he would die from this condition momentarily.  See

26  *Wharton*, 122 Cal. App. 2d at 865.  In fact, Plaintiff offers evidence that Potter's health was stable

27  in the days and weeks leading up to his death.  For example, Dr. Bernstein concluded from Potter's

28

1   medical records that his COPD and cor pulmonale conditions were stable from December 26, 2007

2   through June 12, 2009.  [Doc. No. 21-5, ¶ 12(j).]   Additionally, according to Potter's friend

3   Russell Fritz, Potter's health was stable enough to undertake the drive of over 1,000 miles from

4   San Diego to his home in La Ribera alone.  [Doc. No. 21-2, ¶ 4.]

5          Finally, SLIC argues that California law recognizes that a policy may specifically provide

6   that there is no coverage when an otherwise covered cause combines with a non-covered cause to

7   produce a loss.  *Julian v. Hartford Underwriters Inc. Co.*, 35 Cal. 4th 747 (2005).  This principle,

8   however, only applies where the loss is "proximately caused" by the peril expressly excluded from

9   coverage.  *Id.* at 756-757.  According to *Julian*, to avoid coverage in the instant action, Defendant

10   must prove that Potter's poor health, rather than the accident, was the "efficient proximate" or

11   "predominant" cause of death.  Although Defendant may ultimately prove that Potter's health

12   problems were the predominant cause of his death, this is a question of fact for the jury.

13          Accordingly, the Court **DENIES** SLIC's motion for summary adjudication of Plaintiff's

14   breach of contract claim.

15   2.   Amount of Coverage

16          SLIC argues in the alternative that even if there is coverage, the maximum Sawyer is

17   entitled to under the policy is $50,000.  Sawyer argues in response that she is entitled to the

18   $100,000 benefit "for Private Passenger Automobile" accidents.  The Certificate provides

19   $100,000 in coverage if Potter died: "(1) while Occupying a Private Passenger Automobile; (2)

20   through being struck by a land motor vehicle; or (3) while driving for hire a land motor vehicle."

21   [Doc. No. 20-4, Ex. 1, p. 4.]  For all other accidents, the Certificate provides $50,000 in coverage.

22   [*Id.*]

23          Courts must interpret insurance policies according to their plain meaning.  *Waller v. Truck

24   Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (citing California Insurance Code § 1638).  An insurer

25   "has the right to limit the coverage of a policy issued by it and when it has done so, the plain

26   language of the limitation must be respected."  *Nat'l Ins. Underwriters v. Carter*, 17 Cal.3d 380,

27   386 (1976) (citations omitted).  Here, in order to qualify for the $100,000 coverage "for Private

28

1   Passenger Automobile" accidents, the policy language is clear that the insured must die "while

2   occupying a private passenger automobile."  Potter's death does not fit within the plain meaning of

3   the policy because he did not die while "occupying a private passenger automobile" (i.e., he died

4   in the hospital three days after the accident).  Likewise, the other two types of accidents that fall

5   within the $100,000 coverage limit clearly do not apply here.

6          Nevertheless, Sawyer argues that the $100,000 coverage limit should apply here, based

7   upon statements in a marketing letter Potter received from SLIC advertizing the accidental death

8   policy (the "solicitation letter").  The solicitation letter states the policy provides $100,000 in

9   coverage for an "auto accident, whether driver of, or passenger in, a private passenger vehicle.  As

10  a pedestrian, as a result of being struck by any land motor vehicle walking, shopping on vacation,

11  while working; 24 hours a day, anywhere in the world."  [Doc. No. 21-1, Exh. 1.]  According to

12  Sawyer, Potter signed and returned the enrollment certificate based on the representations in the

13  solicitation letter, and therefore SLIC should be bound by the terms set forth in the solicitation

14  letter, rather than those set forth in the Certificate.  [Doc. No. 21, p. 3.]  Sawyer also argues that

15  Potter never received a copy of the master policy and there is no record of SLIC sending or Potter

16  receiving the Certificate, which contains a different coverage clause and different coverage limits

17  than the solicitation letter.  [*Id.*]

18         Under California law, an advertisement, pamphlet or preliminary statement issued for the

19  purpose of soliciting insurance does not constitute a part of the contract, where it is neither

20  attached to the policy nor referred to therein.  *Blos v. Bankers Life Co.*, 133 Cal. App. 2d 147,

21  151-52 (Cal. App. 1st Dist. 1955) (citing *Toth v. Metropolitan Life Ins. Co.*, 123 Cal. App. 185,

22  188 (Cal. App. 1932).  By statute, the policy is the sole measure of the company's liability.  Cal.

23  Ins. Code § 10113.  Therefore, the terms of the Certificate govern this action, not those set forth in

24  the solicitation letter, and $50,000 is the maximum coverage available.

25         Accordingly, the Court **GRANTS** partial summary judgment in favor of SLIC on the issue

26  of the applicable coverage limit.  Sawyer may not recover more than $50,000 for her breach of

27  contract claim.

28

1    ***B.      Bad Faith Claim***

2          SLIC argues that Sawyer's bad faith claim fails as a matter of law because there was a

3    genuine dispute over coverage.  However, Sawyer argues that SLIC acted in bad faith because it

4    acted unreasonably in investigating the claim and denying coverage.

5          To establish a breach of the implied covenant of good faith and fair dealing, a plaintiff

6    must show that the insurer withheld benefits unreasonably and without proper cause.  *Guebara v.*

7    *Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. Cal. 2001).  "The key to a bad faith claim is whether

8    or not the insurer's denial of coverage was reasonable."  *Id.*  "[A] court can conclude as a matter of

9    law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue

10   as to the insurer's liability.  *Id.*  (quoting *Lunsford v. American Guarantee & Liability Ins. Co.*, 18

11   F.3d 653, 656 (9th Cir. 1994.  See also *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th

12   1269, 1280-81 (1994) ("the mistaken withholding of policy benefits, if reasonable or if based on a

13   legitimate dispute as to the insurer's liability under California law, does not expose the insurer to

14   bad faith liability") (citing *Opsal v. United Serv. Auto Ass'n*, 2 Cal. App. 4th 1197, 1205 (1991));

15   *Dalrymple v. United Servs. Auto. Ass'n*, 40 Cal. App. 4th 497, 523 (1995) ("an insurer can

16   erroneously dispute coverage without acting in bad faith").

17         A defendant may invoke the "genuine dispute doctrine" as a basis for summarily

18   adjudicating a bad faith claim when relying on the advice and opinions of independent experts.

19   *Chateau Chamberay Homeowners Ass'n.*, 90 Cal. App. 4th 335, 348 (Cal. App. 2d Dist. 2001)

20   (citing *Fraley v. Allstate Ins. C.*, 81 Cal. App. 4th 1282, 1293, 97 Cal. Rptr. 2d 386 (2000)).  An

21   insurer may not, however, insulate itself from bad faith by simply hiring an expert to create a

22   genuine dispute; expert testimony will not automatically protect an insurer from bad faith claims.

23   *Id.*  In circumstances involving allegations that the insurer failed to conduct a thorough

24   investigation, a claim for biased investigation should go to the jury to decide.  *Id.* at 348-49.

25         As courts repeatedly observe, "'the reasonableness of an insurer's claims-handling conduct

26   is ordinarily a question of fact.'"  *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161

27   (9th Cir. 2002) (emphasis added) (quoting *Chateau Chamberay Homeowners.*, 90 Cal. App. 4th at

28

346); accord *Dalrymple v. United Servs. Auto. Ass'n*, 40 Cal.App.4th 497, 511 (1995) ("In general, where bad faith is alleged, a jury is empowered to resolve conflicting evidence regarding an insurer's conduct and motives.  Bad faith in this context is said to be conduct violating community standards of decency, fairness or reasonableness") (citation omitted)).

Here, SLIC's Senior Claims Examiner, Andrea Taplin, reviewed the documents provided by Sawyer including: (1) Sawyer's accidental death claim form; (2) Report of the Death of an American Citizen Abroad; (3) a letter from Dr. Alejandro Velderrain; (4) a prescription and hospital bill; (5) a letter from Russell Fritz; (6) a letter from Dr. M.C. Rufino Collins Monroy; and (7) a tow truck bill.  [Doc. No. 20-2, ¶¶ 6, 8.]  SLIC requested an accident report, but none existed. SLIC also requested all treatment records for the six months before Potter's death and specific diagnoses for each visit from Potter's primary care Physician, Dr. Mohedin.  Dr. Mohedin did not send Potter's medical records, but he did send a written response from Dr. Mohedin stating he had seen Potter on April 20, 2009, for an exacerbation of his COPD, and on May 18, 2009, he diagnosed Potter with right sided heart failure (Cor Pulmonale) and referred him to a cardiologist. [*Id*. at ¶ 10.]  Based on her review of the documents provided by Sawyer, Taplin denied Plaintiff's claim because "Potter's death was not accidental under the terms of the SLIC Certificate."  [*Id*. at ¶ 11.]

However, there is evidence that SLIC did not take any additional steps to investigate the accident besides reviewing the documents submitted by Sawyer and Potter's doctor.  For example, SLIC did not investigate: (1) where the accident occurred; (2) the conditions of the roadway where the accident occurred; (3) why Potter went off the road; (4) the condition of the vehicle after the accident; (5) or what trauma Potter suffered as a result of the accident.  [Doc. No. 21, pp. 21-22, citing Exh. 16.]  Furthermore, SLIC did not consult a medical expert to determine whether there was a medical connection between the motor vehicle accident and Potter's death.  [*Id*. at p. 22, citing Exh. 16.]  Finally, SLIC did not contact or follow up with witnesses with information about the accident, such as Potter's friend, Russell Fritz, with whom he was in contact before and after the accident, the tow truck driver that picked Potter up from the scene of the accident, and Potter's

1    treating cardiologist.  [*Id*. at pp. 22-23, citing Exh. 16.]  This evidence raises a triable factual issue

2    concerning the reasonableness of SLIC's handling of Potter's claim.  Accordingly, the Court

3    **DENIES** Defendant's motion for summary judgment on Plaintiff's bad faith claim.

4    *C.      Claim for Punitive Damages*

5            Sawyer seeks punitive damages for her claim for breach of the implied covenant of good

6    faith and fair dealing.  Under California law, punitive damages are recoverable only "where it is

7    proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud,

8    or malice."  See Cal. Civ. Code § 3294(a).  "If the insurer did not act in bad faith, punitive

9    damages are unavailable."  *American Cas. Co. v. Krieger*, 181 F.3d 1113, 1123.  Plaintiff has

10   failed to present evidence that demonstrates a genuine issue of material fact as to whether SLIC is

11   guilty of fraud, oppression or malice.  Accordingly, the Court **GRANTS** Defendant's motion for

12   summary judgment on the issue of punitive damages.

13                                        **CONCLUSION**

14           For the reasons stated above, the court hereby **ORDERS AS FOLLOWS:**

15           (1)      Defendant's motion for full summary judgment on Plaintiff's claim for breach of

16                    contract is **DENIED**;

17           (2)      Defendant's motion for partial summary judgment on the issue of the amount of

18                    damages for Plaintiff's breach of contract claim is **GRANTED,** and Plaintiff may

19                    not recover more than $50,000 in damages for this claim;

20           (3)      Defendant's motion for partial summary judgment on Plaintiff's claim for breach of

21                    the implied covenant of good faith and fair dealing is **DENIED**; and

22           (4)      Defendant's motion for partial summary judgment on the issue of punitive damages

23                    is **GRANTED**.

24           **IT IS SO ORDERED.**

25   DATED:  February 2, 2012

26                                                    *Michael M. Anello*

27                                                    Hon. Michael M. Anello
                                                     United States District Judge

28